# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

JAMES H. HAIRSTON,

                 Petitioner,

      v.

RANDY BLADES, Warden of the Idaho
Maximum Security Institution,[1]

                Respondent.

Case No. 1:00-CV-00303-BLW

**MEMORANDUM DECISION
AND ORDER**

      The Court previously dismissed several claims in this capital habeas corpus matter as procedurally defaulted or lacking in merit. (Dkt. 125.) Currently before the Court is the parties' briefing on the merits of the remaining claims in the Second Amended Petition. (Dkts. 161, 171.) Also pending is Petitioner's Motion for an Evidentiary Hearing and Petitioner's Motion to Expand the Record. (Dkts. 154, 155.)

      The Court has carefully reviewed the record and has considered the parties' written and oral arguments. For the reasons set forth more fully below, the Court will deny Petitioner's motions to develop and present new evidence on selected claims. The Court further concludes that Petitioner is not entitled to habeas relief, and the Second Amended Petition will be dismissed.

---

[1] The current Warden of the Idaho Maximum Security Institution is substituted as the proper Respondent for Dave Paskett. Fed. R. Civil P. 25(d).

# BACKGROUND

## 1. Trial and Sentencing

In 1996, Petitioner James Hairston was sentenced to death for murdering William and Dalma Fuhriman in their home near Downey, Idaho, as he was passing through the area with an acquaintance. The Idaho Supreme Court found the material facts to be as follows:

> On January 6, 1996, Hairston and a companion, Richard Klipfel, were driving from Grand Junction, Colorado, to Spokane, Washington. They stopped at the Fuhrimans' ranch because they had run out of money and could not continue their journey. The Fuhrimans invited Hairston and Klipfel into their home and offered to help them find jobs. While Mr. Fuhriman was sitting at a kitchen table looking at a phone book, Hairston shot him in the head and then shot Mrs. Fuhriman. Hairston and Klipfel took $30 in cash, credit cards, and some personal property from the Fuhrimans' home and continued their journey. Hairston and Klipfel pawned some of the Fuhrimans' property. They purchased several items with the credit cards including toy remote control cars, tires, food, gas, and lodging. They also attempted to purchase a Harley Davidson motorcycle and $2500 worth of snowboarding equipment, but the credit card was rejected. Hairston and Klipfel were apprehended together near Clarkston, Washington, three days after the murders.

*State v. Hairston*, 988 P.2d 1170, 1174-75 (Idaho 1999) (*Hairston I*).

Based on these events, the State charged Hairston and Klipfel with two counts of first degree murder and one count of robbery. (State's Lodging A-1, pp. 23-24.) The Bannock County Public Defender, Randall Schulthies, was appointed to represent Hairston, and his Chief Deputy, Thomas Eckert, was assigned as co-counsel. (State's Lodging A-1, pp. 31-32.) Early in the case, defense counsel's request for an investigator was granted. (State's Lodging A-1, pp. 38, 75-76.) Although the trial court later ordered

the Public Defender's Office to use its own funds to pay for the investigator, it invited counsel to request additional funds "if the budget item is depleted or if there is an objection to this Order." (State's Lodging A-1, p. 162.)

Klipfel eventually pled guilty and testified as a State's witness against Hairston. (State's Lodging A-7, pp. 1713-2000.) Klipfel and Hairston each testified that the other man shot the Fuhrimans. (State's Lodging A-7, p. 1729; A-8, pp. 2256-57.)

On September 6, 1996, the jury found Hairston guilty as charged. (State's Lodging A-8, pp. 2604-05.) The trial court granted defense counsel's request for a psychological evaluation as part of the capital sentencing proceeding, and it appointed Dr. Mark Corgiat to interview Hairston and to submit a report. (State's Lodging A-4, p. 758.)

Two days before the date the sentencing hearing was set to begin, counsel filed a motion to appoint a "mitigation specialist," which is an investigator with particular expertise in compiling a capital defendant's social and mental health history. (State's Lodging A-5, pp. 819-27.) A hearing was held, and the trial court denied the motion after concluding that the current defense team was able to investigate and present mitigating evidence sufficiently without a mitigation specialist. (State's Lodging A-8, pp. 2629-30.) The court granted a brief continuance, and the sentencing hearing began on November 7, 1996. (State's Lodging A-8, p. 2635.)

The State's only witness at the hearing was one of the Fuhrimans' children. (State's Lodging A-8, p. 2649.) In mitigation, Hairston's counsel offered the testimony of Hairston's mother, a fellow inmate named James Martin, and Barbara Garrett, who had

been a grandmotherly figure to Hairston in his youth. (State's Lodging A-8, pp. 2695-2668.) The psychologist, Dr. Corgiat, was not called as a mitigation witness. (State's Lodging A-8, pp. 2643-44.)

The trial court found that the State had proven four statutory aggravating circumstances beyond a reasonable doubt: (1) at the time the murder was committed, Hairston also committed another murder, Idaho Code § 19-2515(h)(2) (1995); (2) Hairston exhibited an utter disregard for human life, Idaho Code § 19-2515(h)(6); (3) the murder was committed in the perpetration or attempt to perpetrate robbery and burglary and Hairston killed, intended the killing, or acted with reckless indifference to human life, Idaho Code § 19-2515(h)(7); and (4) Hairston exhibited a propensity to commit murder that will probably constitute a continuing threat to society, Idaho Code § 19-2515(h)(8). (State's Lodging A-5, p. 876.) The trial court also listed mitigating circumstances in eleven separate categories, but it determined that these circumstances "weigh as pebbles in comparison to a boulder with respect to the cold-blooded, calculated, premeditated murders of Duke and Dalma Fuhriman." (State's Lodging A-5, p. 880.)

On November 15, 1996, the trial court sentenced Hairston to death for each count of first degree murder and to fixed life in prison for robbery. (State's Lodging A-8, pp. 889-93.)

### 2. Post-Conviction and Appeal

Two weeks after Hairston was sentenced to death, the trial court appointed new counsel, David Parmenter, to represent him in Idaho's special pre-appeal post-conviction

proceeding applicable to capital cases. (State's Lodging A-5, pp. 904-05.) The court set Parmenter's compensation at a maximum of $10,000, unless counsel demonstrated a need to exceed that amount in "an appropriate motion." (*Id*.) The court also granted Parmenter's request for an investigator but capped the authorization at $1,000, absent a showing of good cause for additional funds. (State's Lodging B-9, p. 46.)

Parmenter lodged an initial petition for post-conviction relief within 42 days of judgment, as required by Idaho Code § 19-2719, but the court gave him leave to file an amended petition once the court reporter had completed the trial transcripts. (State's Lodging B-9, pp. 6-32, 45.) The transcripts were finished and delivered to the Court and counsel a little under four months after Parmenter had been appointed, and on May 22, 1997, he filed an amended petition. (State's Lodgings A-5, p. 917, B-8, p. 85.) On June 6, two weeks before the date set for an evidentiary hearing, Parmenter submitted a motion to continue the hearing and a motion for the appointment of a mitigation specialist. (State's Lodging B-9, pp. 124-29, 135-37, 155-56, 166-68.) Both motions were denied. (State's Lodging B-9, pp. 169-70.)

The evidentiary hearing proceeded as scheduled on June 19, 1997. (State's Lodging B-11.) Lead trial counsel Randall Schulthies testified, as did Hairston and other witnesses. (State's Lodging B-11.) Hairston's sister also testified extensively about his difficulties during his developmental years. (*Id*.) At the conclusion of the evidentiary hearing, the trial court denied relief. (State's Lodging B-10, pp. 294-343.)

On appeal, the Idaho Supreme Court affirmed Hairston's convictions, death

sentences, and the lower court's order denying post-conviction relief. *Hairston I*, 988 P.2d at 1192-93.

### 3. Federal Habeas and Successive State Post-Conviction Proceedings

Hairston next proceeded to federal court, and this Court appointed new counsel, who filed an initial Petition for Writ of Habeas Corpus on December 15, 2000. (Dkt. 23.) Hairston soon returned to state court with a second petition for post-conviction relief, and this Court stayed the federal case. (Dkt. 62.) The state district court dismissed the second petition, and the Idaho Supreme Court later dismissed the appeal. *Hairston v. State*, 156 P.3d 552 (Idaho 2007) (*Hairston II*).

This Court lifted the stay, and Hairston filed a Second Amended Petition on January 16, 2007. (Dkts. 92, 99.) Respondent moved to dismiss selected claims as procedurally defaulted or untimely (Dkt. 107), and the Court dismissed, with prejudice, Claims 6 (in part), 7, 10, 11, 12, 14 (in part), 15, 16, 17, 18, 19, 23, 25, 27, and 28 (trial and sentencing portion). (Dkt. 25, p. 40.)

Currently pending are Hairston's motions for new evidentiary development on Claims 13, 20, 21, 26, and 28. (Dkts. 154, 155.) The parties have fully briefed these motions, and they have also submitted final briefing on the merits of all of the remaining claims in the Second Amended Petition. (Dkts. 161, 171, 185.)

The Court has reviewed the parties' briefing and has heard oral argument. It is now prepared to rule on these matters.

# LEGAL FRAMEWORK FOR HABEAS REVIEW

The provisions of the Anti-terrorism and Effective Death Penalty Act (AEDPA) are applicable to this case. Under AEDPA, the Court cannot grant habeas relief on any federal claim that the state court adjudicated on the merits unless the adjudication of the claim:

1.      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

Section 2254(d)(1) has two clauses, each with independent meaning. For a decision to be "contrary to" clearly established federal law, the petitioner must establish that the state court applied "a rule of law different from the governing law set forth in United States Supreme Court precedent, or that the state court confronted a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrived at a result different from the Court's precedent." *Williams v. Taylor*, 529 U.S. 362, 404-06 (2000). To satisfy the "unreasonable application" clause, the petitioner must show that the state court was "unreasonable in applying the governing legal principle to the facts of the case." *Williams*, 529 U.S. at 413. A federal court cannot grant relief simply because it concludes in its independent judgment that the decision is incorrect or wrong; the state court's application of federal law must be objectively

unreasonable. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002). The state court need not cite or even be aware of the controlling United States Supreme Court decision to be entitled to AEDPA deference. *Early v. Packer*, 537 U.S. 3, 8 (2002).

To be eligible for relief under § 2254(d)(2), the petitioner must show that the state court's decision was based upon factual determinations that were "unreasonable in light of the evidence presented in the State court proceeding." *Id.* Under all circumstances, state court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A petitioner is not entitled to an evidentiary hearing in federal court if he "failed to develop the factual basis of a claim in State court proceedings," unless he can show that (1) the claim relies on a retroactively applicable rule of constitutional law, or (2) that the factual predicate could not have been discovered through the exercise of reasonable diligence, and that the facts underlying the claim would establish by clear and convincing evidence that but for the constitutional error no factfinder would find the petitioner guilty. 28 U.S.C. § 2254(e)(2).

## DISCUSSION OF THE REMAINING CLAIMS

### Admission of the Colorado Evidence (Claim 1)

Before trial, Hairston filed a motion in limine seeking to exclude all evidence related to a robbery and shooting of a convenience store clerk in Colorado two days before the Fuhrimans were murdered. This evidence included the victim's identification

of Hairston as the person who shot her. The police were also able to connect the weapon in the Fuhriman homicides to the robbery.

The trial court changed its mind about the admissibility of the "Colorado evidence" several times. Before trial, it concluded that the State had not sufficiently demonstrated the existence of a plan tying the two events together and that the probative value of the evidence was outweighed by its prejudicial effect. (State's Lodging A-1, p. 174.) The court quickly revisited its ruling and determined that the identity of the shooter would be a material and disputed fact, and the State could introduce the evidence to prove that fact under Idaho Rule of Evidence 404(b). (State's Lodging A-2, pp. 293-300.) At Hairston's request, it reconsidered its decision yet again and precluded the State from introducing the evidence. (State's Lodging A-2, p. 350.)

The court's final ruling came at trial after the State argued that Hairston had opened the door to admissibility of the evidence because of the nature of his defense and because of his testimony on direct examination. The trial court agreed, pointing specifically to Hairston's testimony that "he never shot the gun; never pointed a gun at anyone before; stated that he signed his name to the credit card hoping that the police would find him." (State's Lodging A-4, pp. 751-52.) The court also concluded that the evidence was admissible to impeach Hairston's credibility. (*Id*. at 752.) As a result, the State presented testimony in its rebuttal case of his involvement in the Colorado incident.

In his first ground for relief, Hairston claims that the admission of the Colorado evidence was so prejudicial that it made his trial fundamentally unfair, violating his right

to due process of law under the Fourteenth Amendment. The Court previously reserved its ruling on Respondent's argument that the claim is procedurally defaulted, noting that the procedural issue was complex and that "it appears that this claim might be more easily resolved on the merits under 28 U.S.C. § 2254(d)." (Dkt. 125, p. 8.) The Court now reaffirms that view.

States have wide latitude to develop and apply their own rules of evidence, and federal habeas review of state court evidentiary rulings is limited. *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Traditionally, a state court's admission of evidence did not provide a basis for habeas relief "unless it rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle*, 502 U.S. at 67-68). In a post-AEDPA case, moreover, "[t]he question is not whether a federal court believes the state court's determination [of the constitutional issue] was incorrect but whether that determination was unreasonable — a substantially higher threshold." *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1420 (2009) (citation omitted).

Given these deferential standards, Hairston cannot show that he is entitled to habeas relief. The trial court did not act arbitrarily in admitting the Colorado evidence. Instead, on several occasions, it carefully weighed the competing arguments under Rules 403 and 404(b) of the Idaho Rules of Evidence. This Court has little doubt that the evidence was damaging to Hairston's defense, but it is equally confident that it was

relevant to issues in the case. In particular, Hairston claimed that Klipfel shot the Fuhrimans without Hairston's prior knowledge or assistance. He also implied that Klipfel owned the murder weapon, and he testified that he only used it to shoot at road signs along the highway. The entire theory of defense was that Klipfel was the driving force behind the crimes in the Fuhrimans' home, and that Hairston was in the wrong place at the wrong time. In other words, the defense placed the identity of the Fuhrimans' killer squarely in issue, and the jury had to choose between Hairston or Klipfel.

The Colorado evidence went directly to that issue and formed a powerful narrative to offset the defense. The Fuhrimans were robbed and murdered only two days after the store clerk had been shot in the head. Klipfel claimed that Hairston had a .25 caliber handgun with him in Colorado, the same caliber that was used to kill the Fuhrimans, and an investigator from Colorado testified that a .25 caliber handgun was used in the robbery. The clerk testified that while she did not actually see the gunshot, it came directly from where the person that she identified as Hairston was standing. There was no indication that Klipfel was in the store at the time. When combined, this evidence made it more likely that Hairston, and not Klipfel, also shot the Fuhrimans with the same handgun and that he intended to rob them when he did. Because the evidence was relevant to central issues in the case, the trial court's decision to admit it under Rule 404(b) of the Idaho Rules of Evidence did not render the trial fundamentally unfair, even though the evidence carried a risk of prejudice. *See, e.g.*, *Estelle*, 502 U.S. at 68 (holding that, because evidence was relevant to an issue in the case, the defendant was not deprived of

due process of law); *see also Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008) (noting that the Supreme Court has never held that the admission of even "propensity" evidence would violate due process).

The decision whether to admit the Colorado evidence may have been a close call for the trial court—a call that other courts might make differently if confronted with the same set of facts in the first instance—but it is not this Court's place on habeas review in a post-AEDPA case to quibble about the finer points of Idaho's evidentiary rules, or to second-guess the weighing of the probative value of the evidence against its prejudicial effect. Those are matters of state law. Hairston has not established that the state court's adjudication of this claim was contrary to or an unreasonable application of clearly established federal law, or that it was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

### The Prosecutor's Cross-Examination of Hairston (Claim 2)

In his second claim, Hairston contends that his Fifth Amendment privilege against self-incrimination was violated when the prosecutor cross-examined him about whether he had previously used the .25 caliber handgun. He contends that the prosecutor's questions exceed the scope of the direct examination and forced him either to confess to prior crimes or to deny them and risk impeachment with the Colorado evidence. On direct appeal, the Idaho Supreme Court denied this claim, concluding that because Hairston "testif[ied] on direct about the possession of the gun and tangentially its ownership," the trial court did not "abuse its discretion by allowing the prosecution to cross-examine

Hairston about his familiarity with the gun." *Hairston I*, 988 P.2d at 1177.

The clearly established federal law governing this claim is derived largely from *Brown v. United States*, 356 U.S. 148 (1958). There, the United States Supreme Court concluded that "if [the defendant] takes the stand and testifies in his own defense his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his [Fifth Amendment] waiver is determined by the scope of relevant cross-examination." *Id.* at 154-55. In reaching that conclusion, the Court noted that once a defendant elects to testify, the Fifth Amendment does not confer "an immunity from cross-examination on the matters he has himself put in dispute." *Id.* at 156-57; *accord McGautha v. California*, 402 U.S. 183, 213-25 (1971) ("It does no violence to the privilege that a person's choice to testify in his own behalf may open the door to otherwise inadmissible evidence which is damaging to his case.").

The Idaho Supreme Court recognized the rule from *Brown* and determined that there was no Fifth Amendment problem in the present case because the prosecutor's questions were related to issues that Hairston had himself put into dispute. This decision was not contrary to or an unreasonable application of *Brown* or other clearly established federal law.

While Hairston's counsel never asked him directly who owned the handgun, his questions and Hairston's answers strongly implied that it was it Klipfel's. Hairston testified that Klipfel "pulled out a gun" and shot the Fuhrimans. (State's Lodging A-8, pp. 2256-59.) At one point, defense counsel focused on which possessions Hairston had

brought into a motel room before he and Klipfel were arrested, suggesting that the gun was one of Klipfel's possessions that he had left in his car. (State's Lodging A-8, pp. 2302-03.) This line of questioning harkened back to defense counsel's cross-examination of Klipfel on the same subject. (State's Lodging A-7, p. 1980.) Hairston also testified that he fired the weapon at road signs merely because "all [his] life [he'd] seen signs with bullet holes in them, and [he] just wanted to shoot a couple of them." (State's Lodging A-8, p. 2297.) The general theme of Hairston's direct testimony was that Klipfel was the instigator of these crimes and that he was an unsophisticated follower who was just along for the ride.

The Idaho Supreme Court reasonably concluded that, by taking the stand and testifying as he did, Hairston had waived his Fifth Amendment privilege not to address questions related to his familiarity with, and prior use of, the murder weapon. Hairston has not shown that he is entitled to relief.

## Prosecutorial Misconduct (Claim 3)

Hairston next claims that he was deprived of his constitutional right to a fair trial because of prosecutorial misconduct. In support, he points to the following instances of alleged misconduct: (1) the prosecution requested, and was granted, an *ex parte* extension of time in which to disclose forensic test results to the defense, preventing the defense from being able to test certain items before trial; (2) the prosecution failed turn over a tape of a jailhouse conversation between Hairston and a visiting former inmate, James Martin, until after Martin testified for the defense; (3) the prosecutor improperly

commented on Hairston's failure to protest that he was innocent during his conversation with James Martin; and (4) the prosecutor called Hairston a "murdering dog" during his closing argument. (Dkt. 99, pp. 13-14.)

The Idaho Supreme Court denied relief on all of these claims. It found no evidence that the prosecutor obtained the pretrial extension of time with the purpose of deceiving the defense. *Hairston I*, 988 P.2d at 1181. Although the Idaho Supreme Court determined that the taped conversation between Hairston and Martin should have been disclosed earlier under Idaho's discovery rules, it nonetheless determined that the defense was not prejudiced by the late disclosure. *Id*. at 1178. It likewise condemned the prosecutor's comments in closing argument but found that the comments were not prejudicial to Hairston given the overwhelming weight of the evidence against him. *Id*. at 1182.

This Court has reviewed the record and concludes that the Idaho Supreme Court's adjudication of the constitutional claim was not unreasonable. The scope of the issue on habeas review is a "narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). A prosecutor's comments or actions that may be considered inappropriate under the rules of fair advocacy, or even reversible error on direct review, do not warrant habeas relief unless the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643.

Initially, this Court sees nothing in the record that rebuts the Idaho Supreme

Court's finding that the prosecutor's *ex parte* request for an extension of time was not motivated by deceit or a desire to gain a tactical advantage. Although Hairston argues that the prosecutor misrepresented to the trial court that she was waiting for a ballistics report, it is not entirely clear whether the State already had this particular report, as Hairston now claims, or even if it did whether the prosecutor's misrepresentation was intentional or an oversight.[2] Regardless, the prosecutor also claimed that the State had not yet received other test results from the state crime lab, which Hairston does not dispute. (State's Lodging A-2, pp. 227-28.)

More to the point, there is no evidence that further scientific testing by the defense would have contradicted the State's results or would have materially assisted the defense in some other way. Hairston notes that at the commencement of the trial the defense was still awaiting serological test results on selected items of his clothing, and that the results that they eventually received did not show the presence of blood or fluids. Trial counsel Randall Schulthies testified during the post-conviction evidentiary hearing that, if defense counsel had this result sooner, they could have discredited Klipfel's testimony because Klipfel claimed that Hairston shot William Fuhriman at close range, suggesting that blood spatter would be on his clothes. (State's Lodging B-11, pp. 67-68.) But Hairston also testified at trial that Klipfel was "pretty close" when, in his version, Klipfel shot Fuhriman (State's Lodging A-8, p. 2257), and similar tests on Klipfel's clothing came

---

[2] At a later hearing, the lead trial prosecutor appeared to claim that Colorado officials had the relevant report in their possession when the extension request was filed. (State's Lodging A-6, p. 90.)

back negative. (*Id* at 82.) What's more, the jury was aware that at least some articles of clothing from both men had been tested and had shown no sign of blood. (State's Lodging A-8, pp. 2086-87, 2095-96.) In light of these circumstances, evidence of additional tests on other clothes with that same result would have carried little force.

Next, the Idaho Supreme Court disapproved of the prosecution's tardiness in disclosing the taped conversation between Hairston and James Martin, but it found no prejudice. *Hairston I*, 988 P.2d at 1179. Hairston argues that had the prosecution disclosed the tape earlier, his counsel could have prepared Martin to testify more efficiently, or perhaps would not have called him as a witness, but the Court finds these arguments to be speculative. Like the Idaho Supreme Court, this Court is skeptical of the prosecution's theory that it was not required to disclose a tape that contained Hairston's own statements, but it agrees with the Idaho Supreme Court that "the fact that Martin may have been better prepared and testified differently, had he know of the existence of the tape, does not make Hairston's trial unfair." *Id.* The trial court instructed the jury that it could consider the tape only for impeachment purposes. (State's Lodging A-8, p. 2375.) Notably, Martin had no right to lie in his testimony regardless whether he was unaware that a tape recording could be used to impeach him; if he had not lied, the tape would not have been admissible.

Finally, this Court disapproves of the prosecutor's statements about Hairston's failure to protest his innocence to Martin and the prosecutor's use of the term "murdering dog" in his closing argument, but finds the Idaho Supreme Court's conclusion that he still

received a fair trial to be a reasonable conclusion. These were isolated comments in a voluminous record that contained strong evidence of Hairston's guilt.

Hairston contends that the Idaho Supreme Court was remiss in not considering the cumulative impact of all of the alleged instances of misconduct when it assessed whether he received a fair trial. This Court is not convinced that the result would be any different if such a cumulative impact analysis had been undertaken. Hairston's claims of prejudice stemming from the prosecutor's *ex parte* request for an extension of time and from the late disclosure of the Martin tape are speculative, at best, and those instances add little weight. The prosecutor's other improper comments were not prolonged or emphasized, and they occurred in a lengthy trial in which the jury considered extensive evidence. Even if all of the instances are taken into consideration, Hairston has not demonstrated that prosecutorial misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."[3] *Donnelly*, 416 U.S. at 643.

## The Admission of the Martin Tape (Claim 4)

Hairston has not provided argument or authority for this claim in his Brief, and he is therefore deemed to have abandoned it. Alternatively, the Court concludes that admission of the tape did not make the trial fundamentally unfair. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). The tape was relevant to impeach aspects of Martin's testimony.

---

[3] Hairston mentions yet another instance in which the prosecutor allegedly used the Martin tape as evidence of Hairston's bad character. (Dkt. 161, p. 34.) But this comment occurred during the penalty phase and it would not have affected the jury's determination of guilt. (State's Lodging A-8, p. 2723.) At any rate, the Idaho Supreme Court had no opportunity to consider this issue, and it is procedurally defaulted.

The proper scope of redaction and the balancing of probative value with the potential for unfair prejudice are matters of state law. Accordingly, Hairston has not established a due process violation.

## The Trial Court's Failure to Dismiss Jurors for Bias (Claim 5)

In his fifth claim, Hairston alleges that he was denied his Sixth and Fourteenth Amendment right to be tried by a fair and impartial jury because the trial court did not dismiss juror Renee Reynolds, for cause, during voir dire. (Dkt. 99, pp. 15-16.) Hairston did not use a peremptory strike to excuse Reynolds, and she served as a member of the jury that found him guilty.[4]

### 1. Factual Background

During jury selection, prospective juror Renee Reynolds stated that she had been a member of a neighborhood watch group and in that capacity she had heard the Bannock County Sheriff "discuss some things" about this case. (State's Lodging A-6, p. 235.) When the trial court asked her whether she still believed that she could make a decision based on what she had heard in the courtroom instead of from some other source, she answered that she could. (*Id.*)

Later, when the prosecutor asked Reynolds specifically what she had heard about the case, she responded that "these two young men went to Majestic Mart in Downey and

---

[4] In his Second Amended Petition, Hairston frames the issue as the trial court's failure to excuse "jurors" for cause (Dkt. 99, pp. 15-16), but the only member of the actual jury, as opposed to the panel of potential jurors, that he discusses is Reynolds. Moreover, there is no constitutional error when a defendant is forced to use a peremptory strike to "cure" an erroneous denial of a challenge for cause, as long as the sitting jury was fair and impartial. *Ross v. Oklahoma*, 528 U.S. 81, 88 (1988).

MEMORANDUM DECISION AND ORDER - 19

there was too many people there and they were planning on getting some money or something, and then they ended up going to the Fuhrimans' farm," where the Fuhrimans were murdered. (State's Lodging A-6, p. 464.) She recalled that the Fuhrimans' credit card "or something was found on these young men." (*Id.*) In response to follow-up questions, Reynolds added that she had heard that "these two young men" had come from Colorado, and they "were going to steal and murder their way all the way to Washington any way they could." (*Id.* at 468.)

The prosecutor asked Reynolds whether, despite her previous knowledge, she could still be objective, and she responded that, "I really tried to put it out of my mind today and I feel I can do that." (State's Lodging A-6, p. 469.) She affirmed that she could decide the case based on the evidence presented in court and not on any outside source. (*Id.*) Though she also agreed that she "might have" formed an opinion when she initially heard about the case, she could not say whether Hairston was guilty as she sat before the court because she had not heard any evidence and she believed in the presumption of innocence. (*Id.* at 471.)

In response to defense counsel's questions, Reynolds also said that she knew Jessie Fuhriman, the victims' daughter-in-law, because her daughter played on the same volleyball team as Jessie's daughter and they sat together during games. (State's Lodging A-6, p. 474.) But she disagreed with some of the other jurors who had expressed an opinion that Hairston was probably guilty, because she believed in the judicial system and because "they're innocent until proven guilty." (*Id.* at 476.)

Defense counsel moved the trial court to dismiss Reynolds for cause. The trial court asked her a series of questions in which Reynolds reaffirmed that she would base her decision on the evidence presented in court and that she would follow the court's instructions. (State's Lodging A-6, pp. 478-79.) The trial court denied defense counsel's motion, and Reynolds sat on the jury. (*Id.*)

### 2. Clearly Established Federal Law

A criminal defendant has a fundamental right under the Sixth and Fourteenth Amendments to a fair trial by an impartial jury. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). To be impartial, the jury must be "capable and willing to decide the case solely on the evidence before it." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984). Actual bias is "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality.'" *United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000). Even if just a single juror is biased, the defendant has been denied his right to fair trial. *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998). A juror may still be qualified to serve, however, even though he is not "totally ignorant of the facts and issues involved." *Murphy v. Florida*, 421 U.S. 794, 800 (1975). Rather, "it is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*

The determination whether a particular juror is biased is highly dependent on credibility and demeanor, and when a state court has conducted an investigation that is "reasonably calculated to resolve the doubts raised about the juror's impartiality," its

ultimate determination on this issue is a finding of fact that is presumed to be correct in a federal habeas proceeding. *Dyer*, 151 F.3d at 974-75; *see also Patton v. Yount*, 467 U.S. 1025, 1036 (1984). A state court's finding that a juror can be fair and impartial will be upheld as long as it is fairly supported by the record. *Patton*, 467 U.S. at 1036-37.

### 3. Discussion

In turning aside Hairston's claim, the Idaho Supreme Court relied on *Murphy v. Florida*, 421 U.S. 794 (1975), and found that Reynolds "made it clear though extensive questioning that she would render a verdict based on the evidence at trial." *Hairston I*, 988 P.2d at 1180-81. This decision was not unreasonable.

In *Murphy*, the defendant was the source of intensive media interest before being charged with robbery. 421 U.S. at 795. He had also been convicted of murder and other offenses in separate cases. Many potential jurors were aware of his crimes, and during jury selection the defense moved to dismiss jurors on that ground, but the trial court denied the motion. The case made its way to the Supreme Court, which concluded that the defendant had shown no Sixth Amendment violation because, though the jurors were generally aware of his past, the "voir dire in this case indicates no such hostility to petitioner by the jurors who served in his trial as to suggest partiality that could not be laid aside." *Id.* at 800-01.

That observation applies equally well in the present case. While Juror Reynolds indicated that she had heard basic versions of the events from outside sources, she reiterated on several occasions that she could base her decision solely on the evidence that

was presented at trial. Hairston characterizes the trial court's rehabilitative questions to Reynolds as a formal exercise that he claims was insufficient to disprove her bias, but Reynolds responded similarly to questions put to her by the prosecutor and defense counsel. She even claimed that in her past she had been "accused of doing something and [she] didn't do," which made her believe more strongly in the presumption of innocence. (State's Lodging A-6, p. 471.) Jurors are not required to be empty vessels devoid of any knowledge of the case or the defendant. *See Skilling v. United States*, 130 S.Ct. 2896, 2914-15 (2010) (noting that "juror *impartiality* ... does not require *ignorance*.") (Emphasis in original). It is true that a juror's claims of impartiality may be undermined by her other responses, but nothing in this record would warrant disregarding the state court's finding that Reynolds was not biased. *Cf. Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (finding that significant evidence in the record to expose as untruthful a juror's testimony during voir dire). Juror Reynolds's acquaintance with the victims' daughter-in-law does not change this result.

Hairston notes correctly that a unique feature that distinguishes the challenge for cause in this case from a run-of-the-mill challenge is the source of at least some of Juror Reynolds's outside knowledge: namely, the chief officer of the law enforcement agency that was investigating the Fuhrimans' murders. For obvious reasons, discussions about the crime with a trusted law enforcement officer may carry a heightened risk that the juror will place undue weight on that information. If this Court were sitting as a trial court, it would explore the circumstances of that situation most carefully, but the Court is now

reviewing the issue on a cold record that contains the juror's repeated assurances that she could decide the case solely on the evidence presented. The parties and the trial judge questioned Reynolds thoroughly, and the trial judge was in a superior position to observe her demeanor and assess the credibility of her responses. It is for this reason that a judge's resolution of questions surrounding a juror's impartiality must be given heavy deference on habeas review. *See, e.g., Patton v. Yount*, 467 U.S. 1025, 1036 (1984).

The present situation is also unlike cases in which the Supreme Court has found a presumption of prejudice based on extremely negative and widespread publicity. *See, e.g.*, *Irvin v. Dowd*, 366 U.S. 717, 725-27 (1961) (finding "deep and bitter prejudice" permeating the community); *Sheppard v. Maxwell*, 384 U.S. 333, 335 (1966) ("massive, pervasive, and prejudicial publicity that attended [the] prosecution"); *Rideau v. Louisiana*, 373 U.S. 723, 725-26 (1973) (concluding that the repeated airing of the defendant's confession on television poisoned the jury pool). Although Hairston points out that the murders were unusual for the Downey area, and that he sought a change of venue, he has cited no evidence that would show the level of pervasive negative publicity or animosity approaching that which existed in *Irvin*, *Sheppard*, *Rideau*, or similar cases.

For these reasons, the Court concludes that Hairston is not entitled to relief on Claim 5.

## Failure to Grant a Continuance (Claim 6)

In his next claim, Hairston alleges that he was deprived of due process when the trial court failed to grant a continuance so that he could complete forensic testing. He has

not briefed this claim. The Court finds that the claim lacks merit in any event, both because Hairston has not established an "insistence upon expeditiousness in the face of a justifiable request for delay," *see Ungar v. Sarafite*, 376 U.S. 575, 589 (1964), and because he has not demonstrated prejudice for the reasons that the Court has already discussed with respect to Claim 3.

## Duplicative Aggravating Circumstances (Claim 8)

In Claim 8, Hairston alleges that his Eighth and Fourteenth Amendment rights were violated because the "utter disregard" aggravating circumstance duplicates the aggravating circumstance that the murder was committed during a robbery with an intent to kill or with reckless indifference to human life.

Like Claim 6, Hairston has provided no argument or authority to support the claim in his merits briefing. Regardless, the United States Supreme Court has noted that "[w]e have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid ..." *Jones v. United States*, 527 U.S. 373, 398-99 (1999). Because there is no clearly established federal law that duplicative aggravating circumstances violate the Eighth or Fourteenth Amendment, Hairston would not be entitled to relief under 28 U.S.C. § 2254(d). *See, e.g., Carey v. Musladin*, 549 U.S. 70, 77 (2006).

## Propensity to Commit Murder (Claim 9)

Hairston next contends that the trial court's finding that he had a "propensity to commit murder that will probably constitute a continuing threat to society" was either not supported by sufficient evidence or was proven by evidence that should not have been

considered. His primary complaint appears to be that the trial court should not have considered the Colorado evidence in deciding the appropriate sentence.

Because Hairston has not briefed this claim, he has not offered any clearly established federal law prohibiting a capital sentencing body from considering unadjudicated prior crimes evidence for whatever probative value it may have, and the Court is aware of none. More than sufficient evidence supported the trial court's finding of a dangerous propensity to commit murder, including Hairston's impulsive decision to kill two people at random for their money within days of shooting a store clerk in Colorado for the same reason, presented against a backdrop of his cavalier attitude, braggadocio behavior, and other reckless activities in the days and weeks that followed.

### Passion and Prejudice (Claim 13)

Hairston alleges that several factors coalesced to make his death sentence the result of passion or prejudice, including the "rural, close-knit community in which the offense was committed," his "status as an outsider from Colorado," the reaction of the community to the crimes, prosecutorial misconduct, and the trial judge's unfavorable rulings, such as the denial of a continuance for the defense and the admission of the Colorado evidence. (Dkt. 99, pp. 25-26.)

This claim is a collection of unrelated facts which, when woven together, simply do not add up to overwhelming passion or prejudice. It is true, for instance, that the community in which the murders occurred was rural and that the co-defendants were from Colorado, but Hairston has pointed to no firm evidence of such widespread antipathy

toward him that a fair trial would have been impossible. The Court has previously discussed his claims of prosecutorial misconduct, and will not tread that ground again here. In addition, a trial judge's unfavorable rulings, by themselves, do not show bias or prejudice. *Liteky v. United States*, 510 U.S. 540, 555 (1994).

The Idaho Supreme Court's conclusion that the death sentence was not the product of passion, prejudice, or any other arbitrary factor was reasonable, and habeas relief will be denied.

### Idaho's Death Penalty Statutory Provisions Fail to Channel the Sentencer's Discretion (Claim 14)

The Court previously concluded that Hairston had properly exhausted this claim only insofar as he alleges "that the aggravating circumstances in Idaho Code § 19-2515 apply equally to all first degree murder defendants and do not provide a meaningful way to distinguish between those who deserve capital punishment and those who do not." (Dkt. 125, p. 20.) However, the claim is conclusory and exceptionally vague, and Hairston has not clarified it in his briefing. The Court will not speculate, and relief will be denied.

### Conflict of Interest by Extradition Counsel (Claim 20)

Hairston alleges that he was "denied his federal constitutional right to the effective assistance of counsel under the Sixth Amendment," because the counsel who represented both Hairston and Klipfel in extradition proceedings in Washington suffered from a

conflict of interest.[5] (Dkt. 99, p. 33.)

**1. Factual Background**

On January 4, 1996, Hairston and Klipfel were involved in the robbery and shooting in Colorado. Local police issued an "attempt to locate" bulletin to neighboring law enforcement agencies for the two suspects, who were believed to be on their way to Washington. Two days later, the Fuhrimans were killed in their home. Hairston and Klipfel made their way through Idaho and, on January 9, were arrested in Clarkston, Washington. A public defender, Gary Carpenter, was appointed to represent both suspects in their extradition proceedings.

Investigators from Idaho and Colorado traveled to Washington. On January 12, Klipfel chose to talk to investigators and implicated Hairston in the murder of the Fuhrimans. Hairston did not speak with the police. On January 16, a Bannock County sheriff's deputy provided an affidavit of probable cause to an Idaho magistrate judge. (State's Lodging A-1, pp. 10-21.) The magistrate judge signed a criminal complaint, and an arrest warrant was issued. (State's Lodging A-1, pp. 23-25.) Hairston waived extradition and made his first appearance in Idaho on January 22. (State's Lodging A-1, p. 31.) At his initial appearance, the magistrate judge appointed Randall Schulthies as counsel.

Hairston contends that Gary Carpenter had a conflict of interest based on his

---

[5] At oral argument, Hairston's counsel conceded that there is no Sixth Amendment right to counsel at an extradition proceeding. Because it is unclear whether he intended to concede that he is not entitled to relief under any theory, the Court will address the claim.

simultaneous representation of the two suspects in the Washington extradition matter. He alleges that Carpenter did not inform him that Klipfel had decided to speak with the police, which was detrimental to him because he was unable to get his version of the events to law enforcement in a timely manner. The Idaho Supreme Court denied this claim after concluding that Hairston had failed to prove that Carpenter actively represented conflicting interests. *Hairston I*, 988 P.2d at 1185.

### 2. Clearly Established Federal Law

A criminal defendant has a right under the Sixth Amendment to the effective assistance of counsel at all critical stages of a criminal prosecution. *Gideon v. Wainwright*, 372 U.S. 335 (1963). The Supreme Court has held that "[w]here a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). A petitioner who can show an adverse affect on counsel's representation due to an actual conflict of interest is generally freed from demonstrating a stronger showing of prejudice. *Mickens v. Taylor*, 535 U.S. 162, 166-67 (2002).

The right to counsel under the Sixth Amendment does not attach, however, until the initiation of formal adversarial judicial proceedings, whether by way of indictment, information, arraignment, or preliminary hearing. *United States v. Gouveia*, 467 U.S. 180, 187-89 (1984). This is true even if an individual has developed an attorney-client relationship before he is charged with a crime. *Moran v. Burbine*, 475 U.S. 412 (1986).

As Hairston now concedes, the Supreme Court has also never held that an

extradition proceeding is a critical stage of a criminal prosecution such that the right to counsel would be required by the Sixth Amendment, and decisions in the lower courts are squarely to the contrary. *See, e.g., Anderson v. Almeida*, 397 F.3d 1175, 1180 (9th Cir. 2005) (noting that "we find that the state appellate court followed Ninth Circuit law in finding that no right to counsel attaches at arrest or at an extradition hearing"); *Chewning v. Rogerson*, 29 F.3d 418 (8th Cir. 1994) (holding that an extradition matter is not a critical stage); *DeSilva v. DiLeonardi*, 181 F.3d 865, 868-869 (7th Cir. 1999) (same); *Judd v. Vose*, 813 F.2d 494, 497 (1st Cir. 1987) ("an extradition hearing has a 'modest function' not involving the question of guilt or innocence, and is not a 'criminal proceeding' within the meaning of the Sixth Amendment").

### 3. Discussion

In light of the clearly established federal law governing this claim, Hairston cannot show that the Idaho Supreme Court's denial of relief was objectively unreasonable. At the time that Carpenter represented Hairston, and when Klipfel decided to speak with investigators, formal charges had not yet been filed in Idaho. Therefore, Hairston's Sixth Amendment had not attached to the Idaho matter. Moreover, a Sixth Amendment right to counsel does not apply in extradition matters.

Even if some type of constitutional right to conflict-free counsel did exist, the Idaho Supreme Court's determination that Hairston had not proven that Carpenter actively represented conflicting interests is a reasonable one based on the record before it. Hairston testified about this subject at the post-conviction evidentiary hearing. He

claimed that Carpenter was "basically just representing us for extradition." (State's Lodging B-11, pp. 34-35.) Hairston was aware that Carpenter was also representing Klipfel but he claimed that Carpenter did not tell him that Klipfel was speaking with investigators. (*Id.* at 35, 37.) With the benefit of hindsight, Hairston asserted hat he would have been eager to speak with the police in Washington, had he known that Klipfel was talking, just to "let them know [his] side of the story." (*Id.* at 38.)

Hairston's lead trial counsel testified at the post-conviction hearing about the perceived conflict. He claimed that his office rarely represented two defendants charged with the same crime, and if one defendant is turning on the other defendant, "you have a conflict of interest at that point." (State's Lodging B-11, p. 54.) He believed this was true even during an extradition proceeding, thought he admitted on cross-examination that an extradition proceeding is generally limited to a few procedural issues. (*Id.* at 78.) He also admitted that Hairston later decided not to speak with the police. (*Id.* at 79.)

Based on the evidence presented in the post-conviction action and on the record available to the state courts, Hairston did not establish a conflict of interest. An actual conflict of interest for constitutional purposes is not found in a "mere theoretical division of loyalties," *see Mickens v. Taylor*, 535 U.S. 162, 171, 172 n. 5. (2002), and there was no evidence before the state court that Carpenter failed to advise Hairston that Klipfel had decided to talk to investigators out of duty of loyalty to Klipfel.

4. Expansion of the Record

Hairston now attempts to rely on additional material that was not before the state

courts. He has lodged with the Court a copy of a motion to suppress filed in Klipfel's case, a transcript of the suppression hearing, and an affidavit signed by Klipfel on August 8, 1996, all of which contain additional information related to the Washington proceedings. (Dkt. 154.) He has also filed a motion to expand the record to include this material.

Under Rule 7 of the Rules Governing Section 2254 Cases, a federal district court has the authority to expand the record in a habeas proceeding with "additional materials relating to the Petition." Habeas Rule 7 must be construed in light of provisions limiting new evidentiary development in AEDPA cases. Specifically, 28 U.S.C. § 2254(e)(2) prohibits an evidentiary hearing in federal court when the petitioner failed to develop the factual basis of a claim in state court, unless one of two narrow exceptions is applicable. This restriction applies with equal force when the petitioner seeks relief on new evidence without an evidentiary hearing. *See Holland v. Jackson*, 542 U.S. 649, 652 (2004); *accord Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005).

A petitioner will be freed from the restraints of § 2254(e)(2) if the district court concludes that he was not at fault for the lack of factual development in state court. *Williams v. Taylor*, 529 U.S. 420, 437 (2000). The resolution of that issue turns on whether the petitioner or his counsel acted with reasonable diligence in state court, which "depends upon whether the [petitioner] made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims." *Id.* at 431.

Applying those standards to the present case, the Court finds that Hairston did not

exercise reasonable diligence in developing the record in the state courts. The documents that he proffers here were available when his post-conviction evidentiary hearing was held, and he has offered no persuasive reason to excuse his failure to present them at that time. The Court is not convinced by his argument that the material should be considered merely as a supplement to cure omissions in the existing record.

Nor does the new material help Hairston's case. The testimony at the suppression hearing reveals that Gary Carpenter told investigators that Klipfel wanted to talk to them but Hairston did not. (Dkt. 154-3, pp. 13-14.) While this information may begin to fill in some of the blanks about Carpenter's actions, it contradicts Hairston's testimony in the post-conviction matter that he was eager to give his side of the story. The new information also underscores that Idaho had not yet charged Hairston with any crimes when Klipfel decided to talk, that the focus was initially on extradition to Colorado, and that the scope of Carpenter's representation was limited. Whatever might be said about the wisdom of Carpenter's apparent nonchalance about which of his clients facing possible murder charges spoke to the police, it appears that his advice, or lack thereof, was the product of what he perceived to be his limited role rather than the result of a conflict of interest.

Finally, while Hairston argues that "the adverse effect is that the integrity of Hairston's trial and sentencing was poisoned by Carpenter's conflicting duties of loyalty," he merely assumes this conclusion without supporting proof. (Dkt. 161, p. 40.) There is no evidence, for instance, that had Carpenter told Hairston that Klipfel was talking to

investigators, and had Hairston also chosen to speak with them, his decision to come forward would have been materially beneficial to him in some way. Speaking freely with them at that early juncture might have been foolhardy, and Schulthies later candidly admitted that he advised Hairston not to talk to the police. Both Klipfel and Hairston eventually testified at the criminal trial, and the jury did not believe Hairston's testimony. Hairston has shown nothing more than a theoretical conflict that did not have an adverse affect on the Idaho case.

## Ineffective Assistance of Counsel (Claim 21)

Hairston next contends that he was deprived of his Sixth Amendment right to the effective assistance of counsel at trial and sentencing. In his Brief on the Merits, Hairston focuses on three claims: (1) trial counsel opened the door to the Colorado evidence on direct examination, (2) counsel "did not recognize and fail[ed] to warn about the danger in testifying," and (3) counsel's investigation into mitigating evidence was deficient. (Dkt. 161, pp. 23-31.)

### 1. Clearly Established Federal Law

To establish a violation of the Sixth Amendment, a petitioner must show that his counsel's performance was unreasonably deficient and the defense was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984).

The standard for attorney performance in a criminal case is that of reasonably effective assistance, measured under prevailing professional norms. *Strickland*, 668 U.S. at 687-88. In assessing whether the representation fell below an objective standard of

reasonableness, counsel's conduct must be viewed under the facts that existed at the time that the challenged act or omission occurred, rather than through the benefit of hindsight. *Id*. at 689. The court must indulge in the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id*.

To prove actual prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. at 694. A reasonable probability is one that is "sufficient to undermine confidence in the result." *Id*.

A state court has significant leeway to apply rules of general applicability, such as the rule for ineffective assistance of counsel, to the different fact patterns that come before it. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). The Supreme Court has recently reaffirmed that "[w]hen §2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 131 S.Ct. 770, 778 (2011).

### 2. Opening the Door to the Colorado Evidence and Advising Hairston to Testify

In a twist on his earlier argument that the trial court violated his due process rights by admitting the Colorado evidence, here Hairston contends that it was his trial counsel's fault for opening the door. He claims that counsel were unaware that the cross-examination of Klipfel, aspects of Hairston's direct testimony, and the overall theory of

defense might allow the State to bring in the damaging evidence in rebuttal. In rejecting this claim, the Idaho Supreme Court concluded that "[i]t appears that counsel made a tactical decision to allow Hairston to testify knowing the risk that it might open the door for the admission of the Colorado evidence. We believe that it was Hairston's testimony and not any failure to act by Hairston's counsel that resulted in the admission of the Colorado evidence." *Hairston*, 988 P.2d at 1187. The Idaho Supreme Court did not unreasonably apply *Strickland*.

Ample evidence supported the state court's finding that trial counsel made a tactical decision in fashioning their defense and in advising Hairston whether to testify. Lead counsel testified during the post-conviction evidentiary hearing that he and co-counsel were "meticulous as we could be" to limit Hairston's direct testimony to matters that would not allow the State to introduce the damaging evidence, and he objected when he believed the State was exceeding the scope of direct examination. (State's Lodging B-11, p. 62.) He also testified that he "discussed with Mr. Hairston the risks of testifying," which included the risk that Hairston's testimony might open the door to the Colorado evidence. (State's Lodging B-11, p. 84.)

The facts confronting counsel at trial included Klipfel's statement incriminating Hairston in the Fuhrimans' murders coupled with strong evidence that Hairston was present with Klipfel through Idaho and took an active or even leading part in the post-murder spending spree. These facts practically dictated a theory of defense that Klipfel, and not Hairston, was the killer. Counsel knew that putting Hairston on the stand carried a

risk that the Colorado incident might come into evidence, but it was apparently a risk that he deemed worth taking. A defense attorney's tactical or strategic choices after an adequate inquiry into the facts and law are virtually unchallengeable. *Gerlaugh v. Stewart*, 129 F.3d 1029, 1033 (9th Cir. 1997). The Idaho Supreme Court's determination that it would not second guess the wisdom of counsel's tactical decision fits squarely within the *Strickland* framework.

### 3. Mitigation Investigation

In his Second Amended Petition, Hairston alleges that he "was denied his federal constitutional right to the effective assistance of counsel under the Sixth Amendment, to a reliable capital sentencing proceeding, under the Eighth and Fourteenth Amendments, and to due process and equal protection of laws under the Fourteenth Amendment by the trial court's denial of resources to hire a mitigation specialist." (Dkt. 99, p. 36.) Hairston focused in his pleading on the *trial court's* denial of the request for a mitigation specialist, rather than on *trial counsel*'s supposedly inadequate mitigation investigation.

That is also how the claim was raised in the Idaho Supreme Court, *see Hairston I*, 988 P.2d at 1190, and this Court previously found the claim to be properly exhausted on that basis. (Dkt. 125, p. 25.) The Court reached its conclusion partly as a result of present counsel's assertion that "this subclaim concerns the deprivation of the effective assistance of counsel by the trial court in denying Mr. Hairston's counsel the necessary funds to procure the services of a mitigation expert in his capital trial." (Dkt. 113, p. 19.) (Emphasis in original.) As Hairston has pled the claim, then, it appears functionally

identical to, and subsumed by, Claim 26, in which Hairston also alleges the denial of adequate resources for a complete defense on these same grounds.

Hairston now attempts to expand the claim in his merits briefing to include allegations that his trial counsel's investigation into mitigating evidence was objectively unreasonable, resulting in prejudice to him. (Dkt. 161, pp. 29-31.) This is a fundamental shift from a claim that emphasizes whether Hairston and his trial counsel were given the basic tools necessary for a fair defense, *see*, *e.g.*, *Ake v. Oklahoma*, 470 U.S. 68 (1985), to a review of trial counsel's decision-making under the standard set forth in *Strickland* and its progeny. Each type of claim relies on a different set of facts and implicates different controlling legal authority.

The Court concludes that Hairston has not properly exhausted a *Strickland* claim on this basis or developed the supporting facts in the state courts. His post-conviction counsel, David Parmenter, initially alleged in his Amended Petition for Post-Conviction Relief that trial counsel were ineffective in failing "to procure necessary expert defense assistance in a complex capital case, and to use a mitigation specialist or expert at sentencing." (State's Lodging B-9, p. 30.) For reasons that are not clear, Parmenter later deleted this allegation. (State's Lodging B-10, p. 211; State's Lodging B-11, p. 2.) The Court does not share Hairston's interpretation of the record that the remaining allegations in the Amended Petition for Post-Conviction Relief could be pieced together to include a claim of an inadequate mitigation investigation. Instead, the claim that counsel failed "to competently represent [Hairston] at a capital sentencing hearing" is directly modified by a

specific allegation that counsel allowed Hairston's "forensic psychiatrist to publish his report to the court and prosecution" and a vague allegation that counsel failed to "research, present evidence, argue and preserve those issues unique and critical to the bifurcated trial on life or death ...". (State's Lodging B-9, p. 30.) Perhaps more importantly, post-conviction counsel did not ask Randall Schulthies any questions at the evidentiary hearing about the scope or direction of the mitigation investigation, nor did he call Tom Eckert to testify. (State's Lodging B-11, pp. 50-87.)

That such evidence was not developed is confirmed by events after the hearing as well. In addressing the deleted claim, the state district court found that "Hairston has not presented any evidence to show that his counsels' [sic] performance on this matter was deficient, nor that it prejudiced his sentencing." (State's Lodging B-10, p. 336.) Critically, on appeal, Hairston limited the mitigation issue to "[t]he failure of the trial court to provide Appellant with an adequate defense experts [sic], including a defense mitigation expert, and requiring the defense to disclose their expert psychologists [sic] opinions ..." (State's Lodging C-13, p. 32.) The Idaho Supreme Court noted that Hairston had raised several claims of ineffective assistance of counsel, but an inadequate mitigation investigation was not one of them. *Hairston I*, 988 P.2d at 1185-87. In his successive post-conviction appeal, Hairston's counsel again framed the constitutional issue as a denial of adequate defense resources. (State's Lodging F-11, p.1.)

Therefore, this Court concludes that Hairston did not fairly present to the same operative facts and legal theories under *Strickland* to the Idaho Supreme Court so that the

highest state court could have a fair opportunity to address the claim. *See*, *e.g.*, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). The claim is procedurally defaulted to the extent that he now attempts to rely on those facts and theories for habeas relief.[6]

Hairston suggests that because post-conviction counsel's motion for a mitigation specialist was denied and because he was operating under time constraints, his ability to develop the claim was thwarted, implying that this should serve as a cause to excuse any default or that there was an ineffective state corrective process in which to press the issue. But Parmenter made no record in the state courts indicating that this was the reason why he did not pursue the claim, and he wholly failed to explore any factual issues surrounding the mitigation investigation with trial counsel at the evidentiary hearing. A more persuasive interpretation is that counsel believed that the focus should be on the trial court's denial of funds for a mitigation specialist before sentencing.

To allow Hairston to expand the claim from the trial court's ruling to trial counsel's actions would fundamentally alter the nature of the claim that was exhausted. Bypassing the state courts and developing the claim several years later at an evidentiary hearing in federal court would undermine the interests of comity, federalism, and finality that AEDPA is intended to promote. *See* 28 U.S.C. § 2254(e)(2). Consequently, the Court will not analyze the mitigation issue under the *Strickland* rubric, and Hairston's motion for an evidentiary hearing to develop a *Strickland* claim will be denied. Nevertheless, the

---

[6] The time to raise a claim of an inadequate mitigation investigation by defense counsel has long since passed. Idaho Code § 19-2719.

**MEMORANDUM DECISION AND ORDER - 40**

Court will address the merits of Hairston's properly exhausted claim that the trial court's denial of a mitigation specialist deprived him of his constitutional right to sufficient resources for a fair defense, Claim 26.

**4. Other Allegations**

Hairston has not briefed any of his other sub-claims of ineffective assistance of counsel. The Court has reviewed those allegations—including that trial counsel did not move to disqualify the trial court and that counsel failed to prevent a psychological report from being attached to the presentence investigation report—and concludes that Hairston has not shown that he is entitled to relief under 28 U.S.C. § 2254(d).

## Rule 11 Jury Instruction (Claim 21(A))

The trial court provided the jury with an instruction describing a "Rule 11" plea agreement, which is the type of binding agreement that Klipfel reached with the prosecution in this case. In his Petition, Hairston alleges that this instruction violated his rights to confrontation and a fair trial. (Dkt. 99, p. 38.)

Hairston has not briefed this claim, and the Court concludes that the Idaho Supreme Court's finding that there was "no reasonable likelihood that the jury interpreted the instruction as an acceptance of Klipfel's testimony," *Hairston I*, 988 P.2d at 1189, was not an unreasonable determination of the facts in light of the evidence presented. Hairston has not carried his burden to establish that he is entitled to habeas relief.

## Reasonable Doubt Instruction (Claim 22)

Hairston next contends that the trial court's instructions diminished the State's

burden to prove his guilt beyond a reasonable doubt. (Dkt. 99, p. 39.) As with the previous claim of instructional error, he has not included this claim within his merits briefing.

In his Petition, Hairston complains primarily about the trial court's use of the term "moral certainty" in its reasonable doubt instruction. This Court agrees with the Idaho Supreme Court that relief is foreclosed by the application of rule in *Victor v. Nebraska*, 511 U.S. 1 (1994), to the jury instructions in this case.

### *Simmons* Claim (Claim 24)

Hairston alleges that "the sentencer's consideration of the speculative possibility that Mr. Hairston could be eligible for parole violated Mr. Hairston's right to a reliable capital sentencing process under the Eighth Amendment and to due process under the Fourteenth Amendment." (Dkt. 99, p. 60.) In support, he relies primarily on *Simmons v. South Carolina*, 512 U.S. 154 (1994). That reliance is misplaced.

In *Simmons*, the United States Supreme Court held that when a defendant's future dangerousness is at issue in the penalty phase of a capital trial, and state law prohibits the defendant's release on parole, the defendant has a due process right to have the jury instructed that he is not eligible for parole. *Id.* at 156. Integral to the Court's decision was that a jury—which may be laboring under a misunderstanding about parole—must be given accurate information to assist it in assessing the defendant's future risk to society. *Id.* at 163-64.

Here, in contrast, Hairston was sentenced by the trial judge, not a jury, and there

was no need for jury instructions in the penalty phase. The judge recognized that under current Idaho law Hairston would not be eligible for parole, but he mused briefly about possible future legal developments and the potential for escape. (State's Lodging A-8, p. 2747.) Nothing in *Simmons* or other clearly established federal law prevents the sentencing authority from considering the possibility that the law may change, as long as it is accurately informed about the current state of the law.

Furthermore, the judge's decision was not based to any appreciable degree on the possibility that Hairston may someday get out of prison. He instead weighed all of the mitigating circumstances and concluded that they did not outweigh each statutory aggravating circumstance such that the death penalty would be unjust. He also noted that life without parole would not be "appropriate given Mr. Hairston's conduct." (State's Lodging A-8, p. 2746.)

### Denial of Resources for a Mitigation Investigation (Claim 26)

Hairston contends that the trial court's "denial of resources to investigate [his] background for mitigating evidence" deprived him of his rights under the Sixth, Eighth, and Fourteenth Amendments. (Dkt. 99, p. 49.) As explained in greater detail below, the Court concludes that Hairston has not shown that the Idaho Supreme Court's adjudication of this claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law, or that it was based on unreasonable findings of fact in light of the evidence presented in state court. The Court further concludes that Hairston has not established that he is entitled to an evidentiary hearing in

federal court to develop new evidence in support of the claim.

**1. Factual Background**

Approximately two weeks after Randall Schulthies entered the case, his request for the temporary appointment of a defense investigator, Wayne Millward, was granted. (State's Lodging A-8, p. 38.) He assigned his chief deputy, Thomas Eckert, to assist as co-counsel.

Three months later, on April 8, 1996, the trial court granted defense counsel's motion to hire Millward for the duration of the case, and it authorized $4,000 for investigative services. (State's Lodging A-1, p. 76.) The trial court also wrote that, "[s]hould additional funds be required counsel shall petition the Court for permission to exceed same." (*Id.*) On May 31, the trial court ordered a partial payment based on Millward's efforts to that point. (State's Lodging A-1, pp. 116-17.) When it became apparent the Public Defender's Office had already set aside $5,000 for investigative services, the court amended its order so that funds for the investigator would come directly from the Public Defender's budget, but that if "said budget item is depleted or there is an objection to this Order, the Public Defender shall contact the Court." (State's Lodging A-1, p. 162.)

On June 7, one month before the trial was set to begin, co-counsel Eckert submitted an affidavit in support of a motion to continue the trial, indicating that he was investigating Hairston's "prior involvement with courts and counsellors" in an effort to "prepare a defense, and to ascertain mitigating factors." (State's Lodging A-1, p. 165.) He

noted that he had sent letters to family members and counseling agencies, but that he was still awaiting information from Colorado West Mental Health Center. (*Id.*) Based in part on this and other information, the trial court continued the trial date to August 13, which it later moved again to August 20. (State's Lodging A-1, p. 173; State's Lodging A-2, p. 233.)

On July 31, Hairston's trial counsel requested another continuance of the trial date, but only on the ground that counsel had not yet had time to test certain evidentiary items because of the State's delay in discovery. (State's Lodging A-2, pp. 309-10; State's Lodging A-6, pp. 83-87.) The trial court denied the request, noting that "there's been plenty of time to get this testing done." (State's Lodging A-6, pp. 95-96.)

The trial commenced as scheduled on August 20. Hairston's counsel presented fifteen witnesses in the defense case-in-chief and three more in surrebuttal. (State's Lodging A-8, pp. 2052-2263, 2473-92.) The jury found Hairston guilty as charged, and the trial court set the aggravation and mitigation hearing for October 25. (State's Lodging A-8, pp. 2604-05.) After the trial, the court granted defense counsel's request for a mental health evaluation in anticipation of sentencing, and it appointed Dr. Mark Corgiat to interview Hairston and to prepare a report. (State's Lodging A-4, p. 758.)

Two days before the date the penalty phase of the trial was set to begin, counsel filed a motion to appoint a mitigation specialist, Mary C. Goody. (State's Lodging A-5, pp. 819-27.) Ms. Goody supplied an affidavit, detailing her background as a mitigation specialist and offering her opinion that a complete social and mental health history of a

defendant was important in capital cases. (State's Lodging A-5, pp. 821-25.) Eckert also filed an affidavit, in which he indicated that he "has attempted to ascertain mitigation factors in the above entitled case, through personal contacts with Defendant's family, friends, and previous treatment providers." (State's Lodging A-5, pp. 826-27.) He claimed that "appointment of a mitigation specialist would be critical to the defense of Mr. Hairston." (*Id*. at 827.)

At the hearing on the motion, Eckert elaborated on his request, noting that early in the case he "began some inquiry into mitigating circumstances regarding the defendant." (State's Lodging A-8, p. 2624.) He also claimed that in the course of his investigation he discovered Mary Goody, and that while the defense had already "acquired a good number" of the documents that Ms. Goody believed would comprise a thorough mitigation investigation, they had not obtained "all of them." (*Id*. at 2625-26.) He stressed that an "outside person, separate and distinct and independent from the attorneys representing the defendant should be the one to do this" to serve as an "impartial witness for the report." (*Id*. at 2629.)

The trial court denied the motion, and an accompanying request for a three-month continuance, after concluding that Hairston had been provided with sufficient investigatory and expert assistance:

> Throughout this case, the Court has endeavored to be fair to the defense in appointing experts requested by the defense, but I think this time it appears to the Court that an adequate defense will certainly be available to the defendant without the so-called mitigation specialist. The defendant is represented by competent counsel and they're fully capable of presenting

whatever mitigating evidence they deem appropriate to the Court. I don't think the motion is timely either, but for those reasons, I'm going to deny your request.

(State's Lodging A-8, pp. 2629-30.) The trial court granted a brief continuance, and the sentencing hearing began on November 7, 1996. (State's Lodging A-8, p. 2635.)

The State's only witness was Crae Fuhriman. (State's Lodging A-8, p. 2649.) Hairston's counsel offered the testimony of three witnesses to explain the dynamics of Hairston's dysfunctional family background and to show that he had expressed remorse for the crimes. (State's Lodging A-8, pp. 2695-2668.) Defense counsel did not call Dr. Corgiat as a witness, and his mental health report was not reviewed or considered by the trial court. (State's Lodging A-8, pp. 2643-44.)

Despite the absence of a mitigation specialist, significant mitigating evidence was put before the trial court, both from the defense and from the material in the presentence investigation report. Based on this information, the trial court found that Hairston was underdeveloped as child, was sexually abused on at least two occasions, and that he was raised by a strong and domineering woman who did not show love or affection. His father abandoned the family when Hairston was a small boy, and Hairston believed that his father could not be located, but his life changed significantly when he learned that his father simply chose not to contact him. The trial court also considered that Hairston was young when the crimes occurred, had previously successfully completed juvenile probation, had no adult criminal record, had expressed remorse for his crimes and behaved well in the county jail. Despite finding these mitigating circumstances, the trial

**MEMORANDUM DECISION AND ORDER - 47**

court sentenced Hairston to death. (State's Lodging A-5, pp. 872-875.)

The trial court appointed new counsel, David Parmenter, in the post-conviction matter. Parmenter's compensation was capped at $10,000, but he was given leave to seek more compensation should the need arise. (State's Lodging A-5, pp. 904-05.) Parmenter was also authorized to hire an investigator, using up to $1,000, unless he could show that he needed to exceed that amount. (State's Lodging B-9, p. 46.)

Seven months after his appointment, and two weeks before the date that the trial court had set for an evidentiary hearing on the Amended Petition for Post-Conviction Relief, Parmenter filed a motion for the appointment of a mitigation specialist and a motion to continue the hearing on that basis. (State's Lodging B-9, pp. 124-29, 135-37, 155-56, 166-68.) He contended, in part, that "despite the substantial inroads into the investigation, [he] still [had] not been able to complete all of the necessary preparation." (State's Lodging B-9, p. 155.) Both motions were denied. (State's Lodging B-9, pp. 169-70.)

Parmenter then withdrew certain claims of ineffective assistance, including a claim alleging that trial counsel were ineffective in failing "to procure necessary expert defense assistance in a complex capital case, and to use a mitigation specialist or expert at sentencing." (State's Lodging B-10, pp. 211.). At the hearing, Parmenter did not ask Schulthies any questions related to the mitigation investigation, including any questions about why counsel believed their investigation was impaired because of the lack of a mitigation specialist or the need for additional resources. Eckert, who had been assigned

mitigation duties, did not testify. Parmenter did present the testimony of Hairston's sister, Adrienne Tidwell, who emphasized in somewhat greater detail the difficulties Hairston had growing up with his difficult mother and absent father. (State's Lodging B-11, pp. 111-144.)

### 2. State Court Rulings

In denying post-conviction relief on this claim, the trial court reiterated its previous decision that Hairston's trial counsel had sufficient resources at their disposal:

> [T]his Court has been unable to find a case, state or federal, wherein a defendant facing the possibility of having a death sentence imposed is entitled to a mitigation specialist. Hairston's trial attorneys were fully capable and knowledgeable to do this and did so in this case. Thus, the Court concludes that the denial of the appointment of a mitigation specialist did not violated Hairston's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution ...

(State's Lodging B-10, p. 320.) (Citation to the record omitted.)

On appeal, the Idaho Supreme Court affirmed. It concluded that because the trial court had appointed a mental health expert, Dr. Corgiat, "to explore possible mitigation," and an investigator "to assist with Hairston's defense both before and during the trial and sentencing," the district court did not violate "the United States or Idaho Constitutions by refusing to also appoint a 'mitigation specialist.'" *Hairston I*, 988 P.2d at 1190.

Hairston returned to state court with a successive application for post-conviction relief, again claiming that his constitutional rights had been violated by the failure to provide adequate resources to complete a mitigation investigation. This time, he supplied an affidavit from Dr. Ricardo Weinstein, a purported mitigation specialist, who believes

that Hairston has brain damage. The state district court dismissed the new application. The court again noted that it "used its sound discretion in determining that [Hairston] was not constitutionally entitled to a mitigation expert at public expense," and that he had the assistance of two attorneys, an investigator, and a psychiatrist. (State's Lodging D-1, p. 98.)

In dismissing the appeal, the Idaho Supreme Court concluded that the issue was precluded by the doctrine of res judicata, because it had been raised before, and that the claim was barred by Idaho Code § 19-2719,  because "it was clearly known within the statutory limits." *Hairston II*, 156 P.3d at 559.

### 3. Clearly Established Federal Law

A state must provide an indigent criminal defendant with the "basic tools of an adequate defense or appeal, when those tools are available at a price to other prisoners." *Britt v. North Carolina*, 404 U.S. 226, 227 (1971). In 1985, the Supreme Court held that, as a matter of due process, an indigent defendant facing a possible death sentence is entitled to the assistance of a psychiatric expert at state expense when his mental state or future dangerousness will be a significant issue in the case. *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). Citing *Britt*, the Court determined that psychiatric assistance was a basic tool of an adequate defense under those factual circumstances. *Id*. at 77.

Since *Ake*, some lower courts have applied the "basic tools" rationale to require, upon a showing of need, other defense services and experts besides psychiatric assistance. *See, e.g., Little v. Armontrout*, 835 F.3d 1240, 1243-44 (8th Cir. 1987); *Yohey v. Collins*,

985 F.2d 222, 227 (5th Cir. 1993); *Grayson v. Thompson*, 257 F.3d 1194, 1231-32 (11th Cir. 2001) (assuming, without deciding, that the due process clause "could require the government, both state and federal, to provide nonpsychiatric expert assistance to an indigent defendant upon a sufficient showing of need."); *but cf. Jackson v. Ylst*, 921 F.2d 882, 886 (9th Cir. 1990) (finding that a rule requiring a state to provide an eyewitness identification expert would be a new rule that could not be applied retroactively on habeas review).

In all cases, the defendant must still make a preliminary showing that an expert would aid in his defense and that denial of assistance would result in an unfair trial. *See*, *e.g.*, *Little*, 835 F.3d at 1244; *Yohey*, 985 F.2d at 227 (scientific evidence must be critical and subject to varying expert opinion).

### 4. Discussion

It is undisputed that the United States Supreme Court has never held that a defendant is entitled to a mitigation specialist as a necessary component of the defense team in every capital case. If the present claim is narrowed to that specific legal issue, then, this Court can easily conclude that Hairston would be unable to show that the Idaho Supreme Court's decision was contrary to or involved an unreasonable application of clearly established federal law. Hairston seems to acknowledge that he cannot prevail on such a narrow theory, and he instead alleges that a mitigation specialist was one of the basic tools necessary for an adequate defense at penalty phase of his trial on the particular facts of his case. Even if the claim is restated in that way, however, he is still unable to

show that the Idaho Supreme Court's decision was objectively unreasonable based on the record before it.

That record shows a fairly robust and active defense team. Hairston was represented by two attorneys, one of whom, Tom Eckert, was assigned mitigation duties early in the case. Before trial, Eckert contacted family members and counselors, looking for evidence from Hairston's past that could be used to counterbalance the State's arguments in aggravation, if the case got that far. Eckert later indicated to the trial court that while the defense team had not obtained all of the documents and records that their proffered mitigation specialist claimed were necessary, they had received "a good number" of them.

Hairston also had the services of an investigator, Wayne Millward, and although the trial court eventually required his compensation to come out of the Public Defender's budget, the court allowed defense counsel to seek more funding if it became necessary. The record shows that Millward was an active part of the defense team, and until the post-trial motion for a mitigation specialist, trial counsel did not request more funds from the court for investigative services. Trial counsel also apparently had sufficient resources to send selected items away for expert forensic testing, and they called an expert witness to testify for the defense, in addition to numerous other lay witnesses. After Hairston was convicted, trial counsel sought the appointment of a mental health expert in anticipation for sentencing, and the court appointed Dr. Corgiat, though counsel chose not to use Dr. Corgiat as a witness.

Most importantly, the defense motion for a mitigation specialist came essentially on the eve of the sentencing hearing and the showing in support was not compelling. The majority of Mary Goody's affidavit was devoted to laying out her background and qualifications, and the other portions focused on what a complete mitigation investigation in a generic capital case would include. Although Eckert claimed that a mitigation specialist was "critical" to the defense, he spoke largely in generalities and about case law recognizing the importance of mitigating evidence in capital cases. He did not offer specifics about what a mitigation specialist could do in the case at hand that the defense team could not do, or had not already done, other than serve as some type of independent and expert evidence gatherer. He admitted the defense had obtained "a number" of the records that the proffered mitigation specialist indicated would be needed for a complete investigation.

In short, Hairston did not establish that a mitigation specialist's skills were so markedly different from those of the two attorneys appointed to his case or from the generalist investigator that had been hired, or that the defense team was so underfunded or overstretched, that without Goody's services they would be deprived of the ability to mount a fair defense at the penalty phase. *Cf. Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985) ("[g]iven that petitioner offered little more than undeveloped assertions that the requested [expert] assistance would be beneficial, we find no deprivation of due process in the trial judge's decision."). Therefore, the current record supports the state court's finding that "[t]he defendant is represented by competent counsel and they're fully

capable of presenting whatever mitigating evidence they deem appropriate." (State's Lodging A-8, pp. 2629-30.)

Even though this Court would tend to agree with Hairston that a mitigation specialist is recognized as a standard component of a capital defense team today, the Court's review is circumscribed by AEDPA and the collateral nature of this proceeding. Given the record that was developed, the state court had wide latitude to exercise its discretion on the matter, and this Court cannot say the state court's determination – that a mitigation specialist or other investigative expert was unnecessary – was an objectively unreasonable decision. Hairston has not established that he is entitled to habeas relief under 28 U.S.C. § 2254.

### 5. New Evidentiary Development

Hairston attempts to avoid this result by seeking an evidentiary hearing to develop the claim more fully in this proceeding. He argues that the absence of a mitigation specialist or other similar expert deprived him of valuable evidence that could have been offered in mitigation of punishment, including expert mental health evidence showing that he suffers from brain damage.

In a case that is governed by AEDPA's provisions, a habeas petitioner is not entitled to an evidentiary hearing in federal court if he failed to develop the factual basis of a claim in state court, unless the petitioner can show that one of two narrow exceptions applies. 28 U.S.C. § 2254(e)(2). For this restriction to apply, the federal court must first conclude that the petitioner was not at fault for the lack of complete factual development.

*Williams v. Taylor*, 529 U.S. 420, 437 (2000).

In his Answer, Respondent invokes § 2254(e)(2) as a barrier to the Court's consideration of new evidence on the claim. (Dkt. 137, ¶ 138.) In his merits briefing, however, Respondent writes that Hairston did not "fail to develop" the facts of the claim, implying that § 2254(e)(2) is *not* a barrier to evidentiary development, "insofar as Hairston raised that claim on appeal and the Idaho Supreme Court adjudicated and rejected that claim on the merits." (Dkt. 172, p. 39.) In this same part of Respondent's brief, he seems to be countering Hairston's argument that there is "an absence of available State corrective process," as defined by 28 U.S.C. § 2254(b)(1)(B), for raising the claim in the state courts. The Court agrees with Respondent that § 2254(b)(1)(B)—an exception to the exhaustion requirement—is simply not applicable because Hairston exhausted this claim, and the present question is whether he is entitled to develop new evidence in federal court on an already exhausted claim. Given the distraction of the § 2254(b)(1)(B) discussion, it is unclear to the Court whether Respondent is now conceding that Hairston's evidentiary hearing request as to this claim is not governed by § 2254(e)(2). Certainly that is how Hairston has interpreted Respondent's argument. (Dkt. 189, p. 1.)

In any event, even if § 2254(e)(2) does not stand in Hairston's way, the Court would decline to hold an evidentiary hearing on this claim. Freed from § 2254(e)(2), Hairston would be entitled to develop new evidence only if he (1) did not receive a full and fair hearing on the issue in the state courts, and (2) has alleged facts that, if true,

would show that he is entitled to relief. *Karis v. Calderon*, 283 F.3d 1117, 1126-27 (9th Cir. 2002).

Hairston contends that he has yet to receive a full and fair hearing on this issue. He argues that the denial of adequate funding and time in state district court prevented him from showing what a full mitigation investigation would have looked like. But this argument skips the preliminary factual showing of *need* that must be shown to the trial court to trigger its duty to grant a motion for expert services; the factual foundation of this claim, as with any *Ake* claim, is a showing of *why* the trial defense team needed the expert resource, not necessarily *what* the expert might have found had the motion been granted. This Court is aware of no external factor that would have prevented Hairston's counsel from presenting and developing the facts on that foundational issue at the appropriate time, facts that could have been derived largely from the members of the defense team. Eckert filed two affidavits with his motion for a mitigation specialist before sentencing, and the trial court held a hearing on the motion at which Eckert was allowed to argue for the additional funding. The court placed no limits on Hairston's ability to make the case with specificity that a mitigation specialist was needed, and Hairston has failed to show that the inquiry into the motion was not full and fair.

Hairston also points to the state court's denial of a second motion for a mitigation specialist in the post-conviction proceeding, and to the expedited nature of that proceeding generally, as factors outside of his control that affected the development of the claim. In a jurisdiction that follows the traditional course of allowing a post-conviction

action after the completion of the direct appeal, by the time the post-conviction action commences an *Ake* claim would presumably either have already been raised and resolved by the highest state court on direct review or forfeited by the petitioner because it was not raised. Idaho's choice to use a special pre-appeal, post-conviction structure muddies this analysis, and is yet another example of unintended consequences flowing from its expedited unitary system.[7] But even assuming that the claim could have been developed in the capital post-conviction matter, Hairston did not avail himself of the opportunity to do so. Schulthies testified extensively at the evidentiary hearing, and yet he was not asked any questions about the mitigation investigation, or the pressing need for a mitigation specialist. Post-conviction counsel failed to offer any testimony from Eckert or Millward. Hairston has now submitted affidavits from Schulthies, Eckert, and Millward, setting out some the defense team's budgetary and investigative concerns (Dkt. 155-2, 155-3, 155-4), but this is precisely the type of evidence that could have been offered in the state courts, either before the sentencing hearing or in the post-conviction action.

In any case, the Court also finds that evidentiary hearing is not warranted because Hairston's new allegations, if proven to be true, do not alter the profile of the claim significantly enough to show that he would be entitled to relief. Taking the new claims of Schulthies, Eckert, and Millward into account, the Court would still conclude that the state court's determination that Hairston was not deprived of adequate resources to

---

[7] Another prominent example being the confusion that surrounds when a convicted capital defendant must raise claims of ineffective assistance of appellate counsel. *See* Dkt. 125, pp. 27-32.

develop a sufficient mitigation case was a reasonable resolution of the constitutional issue. *See Schriro v. Landrigan*, 550 U.S. 465, 474-74 (2007) (holding that a request for an evidentiary hearing must be considered in light of AEDPA's standards for granting habeas relief in § 2254(d)).

Undoubtedly, the proffer of new evidence presents a fuller picture of the budgetary and time constraints facing counsel. Schulthies claims that "we had a very small budget for professional services," in the nature of $3,000 to $5,000 per year. (Schulthies Decl., Dkt. 155-1, ¶ 13.) He asserts that the trial judge "was not someone who was willing to provide us with substantial funding, especially for life history or psychological matters that did not directly relate to the crime and were more pertinent to the development of mitigation." (*Id*. at ¶ 14.) The defense investigator, Wayne Millward, was a retired FBI agent who did not have expertise in mitigation matters, and counsel directed him to work on guilt phase issues. (*Id*. at ¶ 19.)

On the other hand, Schulthies also indicates that he was aware early in the case that mitigating evidence would need to be developed, and that they "began to gather documents that would support a mitigation case," including whether "Hairston had a mental issue that might affect intent capacity or competence." (*Id*. at ¶ 20.) They obtained mental health records from the Colorado West Mental Health Center, where Hairston was treated as a juvenile. (*Id*. at 26.) Schulthies discloses that "we did manage to hire Dr. Mark Corgiat to meet with James Hairston in July of 1996, to see if Hairston might be suffering from a mental disease or defect that might give us a defense," which, notably, is

two months before the trial court appointed Corgiat after the trial concluded to prepare a report for sentencing.[8] (*Id.* at ¶ 31.)

Eckert corroborates many of these points. He notes that "early on, we also began to attempt to gather documents that would support our mitigation case," which included mental health evidence. (Eckert Decl. at ¶ 13.) He contacted Hairston's mother, who pointed him to the Colorado West Mental Health Center, from which he received "extensive" counseling records. (*Id.* at ¶¶ 16, 23.) He also spoke to her "a number of times" before trial, and she informed him about "a bad childhood, that he'd grown up without a father and always wanted a relationship with his father, and that she'd been unable to give him the warmth and emotional support that a mother usually provided to her children." (*Id.* at 18.) They did not have time to interview out-of-state witnesses personally, though they dispatched Millward to talk to witnesses in Colorado who knew Hairston. (*Id.* at 25.) Millward admits that he conducted an investigation into Hairston's "character," but that he was focused primarily on the guilt phase issues and was not trained in conducting life history interviews. (Millward Decl. at ¶ 7.)

The critical inquiry for purposes of this claim on habeas review is whether Hairston's defense team had sufficient time and resources to mount an adequate mitigation defense at the penalty phase of the trial, not whether a mitigation specialist

---

[8] This information also tends to undermine Hairston's argument in this proceeding that Dr. Corgiat was, in essence, solely a neutral court appointed expert rather than a confidential defense expert. It appears that Dr. Corgiat evaluated Hairston at the defense's request and came to some conclusions about his mental health before Corgiat was appointed by the court to prepare a report for sentencing.

may have been helpful to their cause. The proffer shows counsel were assuredly not bestowed with a surfeit of riches and time, but it also reveals that they were aware of the importance of mitigating factors, had access to resources for an investigation, and endeavored to compile a mitigation case.

Moreover, Hairston emphasizes evidence of his alleged brain dysfunction, which he contends establishes prejudice from the denial of a mitigation specialist. This contention assumes too much; that is, Hairston has not drawn a persuasive causal link between the absence of a mitigation specialist — primarily an *investigative* expert — and the lack of evidentiary development on whether he has brain damage, which would be supplied by psychological, psychiatric, or medical experts. Beyond requesting the appointment of Dr. Corgiat, who apparently did not find evidence of brain damage, Hairston did not ask for funding for those types of additional mental health experts in state court. To the extent that the new mitigating evidence is intended to show prejudice from ineffective assistance of trial counsel under a *Strickland* standard, the Court has already determined that a *Strickland* ineffective assistance claim on this basis was not properly exhausted and is procedurally defaulted.

Accordingly, the Court concludes that the new facts do not place the issue in such a different light that Hairston would be able to establish that the state court's adjudication of this constitutional claim, based on its determination that he was given adequate tools and resources for his defense, was an unreasonable one. Hairston is not entitled to an evidentiary hearing.

**MEMORANDUM DECISION AND ORDER - 60**

**Biased Judge (Claim 28)**

For his final claim, Hairston alleges that he was denied an impartial and unbiased judge in violation of his right to due process under the Fourteenth Amendment. The Court previously determined that the claim was procedurally defaulted insofar as Hairston was attempting to claim that the judge was biased at trial and sentencing. (Dkt. 125, p. 34.) The Court considers that matter to be resolved.

Hairston did raise a claim in the Idaho Supreme Court that the trial court judge was not impartial by the successive post-conviction proceeding, but the Supreme Court dismissed that claim after finding that Hairston did not have a right to an "unbiased hearing" in the first instance. In its earlier Memorandum Decision, this Court noted its "concern about the adequacy of this particular line of reasoning, and it chooses to reserve its ruling on the procedural default issue." (Dkt. 125, pp. 34-35.) The Court finds that it is now easier to move directly to the merits of this claim than to confront the procedural issue.

Hairston's claim is based primarily on the district judge's letter to two members of the victims' family, in which he wrote:

> As you are aware the Supreme Court of Idaho has affirmed Mr. Hairston's conviction and sentence.
>
> Now that he has had his appeal, if I had my way, he would be executed tomorrow; however, now [that] the federal court is involved it will probably be 10-15 years before a resolution, which is an abominable system.
>
> I thought you may want a copy of the Decision and enclose one for you.

Please give my regards to your family.

(State's Lodging E-1, p. 61.)

In denying Hairston's motion to disqualify him from the successive post-conviction matter, the judge indicated that he harbored no actual bias or prejudice against Hairston himself and was merely expressing "a general frustration with the system." (State's Lodging E-1, pp. 111-14.)

A fair proceeding in front of an impartial judge is a basic component of due process under the Fourteenth Amendment. *Caperton v. A.T. Massey Coal Co.*, 129 S.Ct. 2252, 2259 (2009); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821-22 (1986); *Tumey v. Ohio*, 273 U.S. 510, 523 (1927). "Fairness requires the absence of actual bias in the trial of a case." *In re Murchison*, 349 U.S. 133, 136 (1955).

Not every situation appropriate for judicial disqualification would be a due process violation were that judge to hear the case. *Lavoie*, 475 U.S. at 828. Questions concerning a judge's qualifications to preside over a case "are, in most cases, answered by common law, statute, or the professional standards of the bench and bar," not the Due Process Clause. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). To succeed on a judicial bias claim, a petitioner must "overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). A judge's failure to recuse himself results in a constitutional violation only where "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Caperton*, 129 S.Ct. at 2257.

Hairston has not shown actual bias or a risk of bias that is too high to be constitutionally tolerable. The judge's decision to write a letter to the Fuhriman family after the conclusion of the direct appeal, expressing that "if [he] had his way, [Hairston] would be executed tomorrow" and decrying the federal system as "abominable," was perhaps not a wise choice, but it shows primarily his frustration with delay. The letter does not overcome the presumption that the judge could decide the issues before him fairly and adequately. Perhaps more importantly, Hairston has not established how the judge's supposed bias in the successive post-conviction proceeding years after trial would have had a "substantial and injurious effect or influence" on his convictions or sentences such that habeas relief would be appropriate. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993); *cf. Franzen v. Brinkman*, 877 F.2d 26 (9th Cir. 1989) (holding that "a petition alleging errors in the state post-conviction review process is not addressable through habeas corpus proceedings.").

## CONCLUSION

The Court previously denied or dismissed Claims 6 (Confrontation Clause portion), 7, 10, 11, 12, 14 (in part), 15, 16, 17, 18, 19, 23, 25, 27, and 28 (trial and sentencing portion). (Dkt. 125, p. 40.) In this Memorandum Decision, the Court now denies relief on Claims 1-5, 6 (due process portion), 8, 9, 13, 14 (remainder), 20, 21, 21A, 22, 24, 26, and 28 (post-conviction portion). The Court also denies Hairston's motions for new evidentiary development on Claims 13, 20, 21, 26, and 28.

There being no claims left to be adjudicated, the case shall be dismissed.

# CERTIFICATE OF APPEALABILITY

As required by Rule 11 of the Rules Governing Section 2254 Cases, the Court evaluates this case for suitability of a certificate of appealability ("COA"). *See also* 28 U.S.C. § 2253(c).

A habeas petitioner cannot appeal unless a COA has issued. 28 U.S.C. § 2253. A COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Mindful that this is a capital case, the Court will certify an appeal over the Court's resolution of Claims 1, 2, 5, 21 (limited to the mitigation sub-claim), and 26 in the Second Amended Petition, including its decision to deny Hairston's requests for discovery, expansion of the record, or an evidentiary hearing on any of these claims, if applicable. The Court has reviewed its other decisions and orders in this case, and it does not find them to be reasonably debatable. The COA shall be limited to the claims listed above.

Hairston may seek to broaden the COA in the Ninth Circuit Court of Appeals, pursuant to Rule 22 of the Federal Rules of Appellate Procedure and Local Ninth Circuit Rule 22-1. He is advised that he must still file a timely notice of appeal in this Court.

# ORDER

IT IS ORDERED:

1.      The Clerk of Court shall substitute Randy Blades, Warden, for Dave Paskett as the proper Respondent in this matter.

2.      Petitioner's Motion to Expand the Record (Dkt. 154) is DENIED.

3.      Petitioner's Motion for an Evidentiary Hearing and Expansion of the Record (Dkt. 155) is DENIED.

4.      The Second Amended Petition for Writ of Habeas Corpus is DENIED, and this cause of action is DISMISSED with prejudice.

5.       The Court issues a Certificate of Appealability over the Court's resolution of Claims 1, 2, 5, 21 (limited to the mitigation sub-claim), and 26 in the Second Amended Petition, which shall also include the Court's decision to deny discovery, expansion of the record, or an evidentiary hearing on any of these claims, if applicable.  The Court shall not certify any other issue or claim for appeal.

6.       Upon the filing of a timely notice of appeal in this case, and not until such time, the Clerk of Court shall forward the necessary paperwork to the Court of Appeals for the Ninth Circuit for the docketing of an appeal in a civil

case.



DATED:  **March 30, 2011**

_____
Honorable B. Lynn Winmill
Chief U. S. District Judge